No. 102,140

STATE OF KANSAS, *Appellee*, v. JUAN GARCIA, *Appellant*.

(283 P.3d 165)

Opinion filed August 17, 2012.

*Meryl Carver-Allmond*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Eric L. Witcher*, county attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

*Per Curiam*: Juan Garcia appeals the district court's denial of his motion to withdraw his nolo contendere plea before sentencing. The majority of the Court of Appeals panel affirmed the denial. Garcia's primary contention is that the district court may have relied upon *State v. Ford*, 23 Kan. App. 2d 248, 930 P.2d 1089 (1996), whose insistence on an allegation of innocence in a presentencing plea withdrawal motion has been rejected by this court.

Garcia's second argument—that his prior convictions were used improperly to increase his sentence because they were not proved to a jury beyond a reasonable doubt—has no merit and will not be further discussed. See *State v. Bennington*, 293 Kan. 503, Syl. ¶ 9, 264 P.3d 440 (2011); *State v. Riojas*, 288 Kan. 379, 388, 204 P.3d 578 (2009); *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002).

Because it is unclear whether the district judge relied upon that part of *Ford* that has been disapproved, we reverse and remand for a new hearing to consider Garcia's motion under the appropriate legal standard.

## FACTUAL AND PROCEDURAL BACKGROUND

The chronological order of events in this case and filing of decisions from our court is critical to an understanding of our ultimate holding. We therefore recite this order in some detail.

On June 18, 2008, Juan Garcia was charged with attempted second-degree murder and intentional aggravated battery. Clinton Peterson was appointed to represent Garcia and negotiated a plea bargain with the State. Under the plea agreement, the State agreed to reduce the aggravated battery charge from a severity level 4 felony to a severity level 5 felony. It also agreed to dismiss the second-degree murder charge and the charges pending in another criminal case. At a later arraignment hearing, Garcia pleaded nolo

contendere to reckless aggravated battery, and the district court dismissed the other charges.

At that hearing, the district court advised Garcia of the potential minimum and maximum sentences on the reckless aggravated battery and further advised that Garcia's actual sentence length would depend on his criminal history:

"THE COURT: . . . Mr. Garcia, without knowing your prior criminal history with the aggravated charge being a level five person felony, if you are convicted, you can be sentenced from 31 months to 136 months in the custody of the Secretary of Corrections and fined up to $300,000 depending upon your financial condition. Do you understand?
"THE DEFENDANT: Yes sir."

The court also informed Garcia that it was not bound by any agreement between the State and his attorney:

"THE COURT: Now, you've heard the announcement of the plea negotiations?
"THE DEFENDANT: Yes.
"THE COURT: Has anyone promised if you enter a plea here today that you will get probation?
"THE DEFENDANT: No.
. . . .
"THE COURT: You understand at the time of sentencing, the Court's not bound by any agreement between your attorney and the County Attorney as to what your sentence should be?
"THE DEFENDANT: Yes.
"THE COURT: You understand the Court's left to its discretion to sentence in compliance with the Kansas Sentencing Guidelines?
"THE DEFENDANT: Yes."

After Garcia's plea was accepted and he was found guilty, a Presentence Investigation Report (PSI) was prepared. It showed Garcia's criminal history score was B. Garcia had expected his criminal history score to be C, apparently believing that only his prior adult criminal convictions would count toward his score, *i.e.*, he was unaware that a prior juvenile adjudication from 13 years before would be treated as a person felony. The score of B more than doubled his presumptive sentence range from 53 to 60 months to 114 to 128 months.

Garcia obtained new counsel and filed a motion to withdraw plea on November 8, 2008, arguing that holding him to his plea would be manifest injustice.

On December 12, 2008, this court filed its decision in *State v. Schow*, 287 Kan. 529, Syl. ¶ 3, 197 P.3d 825 (2008), which held that "[w]here a defendant has pled guilty pursuant to a plea agreement which was based upon a mutual mistake as to defendant's criminal history score, the district court may consider the circumstances giving rise to the mutual mistake to the extent they may implicate the factors applicable to the existence of good cause to withdraw a plea." *Schow* also observed that this court's earlier decision in *State v. Vasquez*, 272 Kan. 692, 696, 36 P.3d 246 (2001), had rejected the proposition that a presentencing motion to withdraw must allege innocence. 287 Kan. at 541. The Court of Appeals decision in *Ford* had been among the Kansas cases stating that a presentencing motion should be justified by an allegation " 'that defendant is not guilty of the offense charged and that the plea was made because of fraud, duress, mutual mistake, or lack of understanding of the charge and the effect of the plea.' " *Ford*, 23 Kan. App. 2d at 251 (quoting *State v. Johnson*, 258 Kan 607, 610-11, 907 P.2d 140 [1995]).

Garcia filed an amended motion on December 31, 2008, to correct his invocation of a manifest injustice standard applicable to postsentencing plea withdrawal to the lesser good cause standard applicable to presentencing plea withdrawal. Garcia relied on the fact that his criminal history score was higher than he expected.

Garcia's amended motion stated that he had informed attorney Peterson that his "criminal history score was a level C, consisting of one person felony conviction and one nonperson/drug felony conviction." The motion implies that Garcia did not inform Peterson that he had a prior juvenile adjudication: "The Defendant was under the impression that the Court was only going to look at the criminal convictions, thus leading him to believe he had only one person felony conviction and one nonperson/drug felony conviction . . . . The Defendant spoke with counsel about his criminal history, stating that he had two felony convictions."

Garcia further stated that the

"focus of plea negotiations was for the duration of the prison sentence and not amending the crime or the nature of the crime . . . . By agreeing to the level 5 felony, the Defendant had bargained to be placed in a sentencing box with a range of [53 to 60] months . . . . The sole purpose of this plea was to control the box in which the Defendant fell for the purpose of sentencing . . . . [I]t cannot be stated nor proven that the Defendant understood the plea that was made, especially given the nature of plea negotiations and the attempt to control where on the sentencing guidelines the Defendant would be placed as a result of the plea."

The motion urged the district court to conclude that the plea had not been understandingly or fairly entered and that the absence of any discussion of juvenile adjudications in the time during which the plea was negotiated and accepted meant the defendant had been misled. Refusal to grant the plea withdrawal would violate Garcia's constitutional rights.

Garcia's amended motion did not cite to the new *Schow* decision or to the 2001 *Vasquez* decision.

The State also did not cite to *Schow* or *Vasquez*. It disputed Garcia's allegation that the parties agreed upon a sentence between 53 and 57 months. In its response motion it stated: "No mention of the Defendant's criminal history was made during the plea negotiations other than that it was believed the Defendant would receive approximately fifty-five (55) months in the Department of Corrections." It requested that Garcia's motion be denied and that, per his criminal history score of B, he be sentenced to between 114 and 128 months in prison.

At the plea withdrawal hearing on January 6, 2009, Garcia's testimony reinforced that his main focus in the plea negotiations was the amount of time he would be serving. When he entered the plea, his understanding was that he would be facing a 53- to 60-month sentence and, although he had a prior juvenile case, he "did not know [it] was going to affect sentencing." Garcia also said that he was misled into accepting a plea deal because he believed his criminal history score was C.

For the State, the prosecutor elaborated upon the reference to a 55-month sentence contained in his response to Garcia's amended motion, alleging it represented only the minimum amount of time Garcia would serve:

"With regard to the negotiations of the plea, I was intimately involved in that, Your Honor. The only reason the 55 months was ever mentioned was to make sure that I was comfortable with *the amount of time at a minimum,* that he was going to do. It wasn't a guarantee this is what you're going to get, any of that. Mr. Peterson [defense counsel] came up to me and said, 'We can send him for 55 months.' I said, 'That sounds fine.' There was no guarantee . . . . That's the only thing that was ever discussed with regard to the quote unquote, 55 month issue." (Emphasis added.)

In short, the prosecutor denied that there had been any meeting of the minds or agreement on Garcia's criminal history score.

The defense nevertheless argued that, because the State wanted Garcia to serve about 55 months:

"[I]t can be [deduced] that the parties were in agreement that that's where his criminal history score was ['C'] . . . . [W]e both agree that that's the box that we thought he was going to land in and that's the box where he moved under, and that's where the sentence was supposed to be."

Defense counsel also made clear at the plea withdrawal hearing that he and Garcia were not alleging ineffective assistance of Garcia's plea counsel:

"And I think my brief explains to the Court that the elements that you must consider for good cause shown [to withdraw a plea] are three. And they are [1] that the defendant was represented by competent counsel. Now, in regards to Mr. Peterson, we're not making a claim that he's incompetent. That's not an issue."

The district court judge denied Garcia's motion. He began by mentioning *State v. Ford,* 23 Kan. App. 2d 248. He then reviewed several factors for determining whether he should permit Garcia's plea to be withdrawn for good cause.

"THE COURT: Well counsel, I've read both briefs and I've dealt with these motions on a number of occasions in the past. You know, one of the cases that the Court has looked at and was cited by the State, was *State v. Ford* at 23 Kan. App. 2d 248. And the Court's well aware of the issues on a motion to withdraw for good cause and the considerations of one [factor whether] the defendant was represented by competent counsel. There's . . . no dispute here. And this court is well aware of the experience and the ability of Mr. Peterson as an attorney to represent defendants in criminal matters. And this Court has no doubt about the competence of Mr. Peterson. And that's not an issue being made here."

The judge continued by addressing a second factor for determining whether a plea should be withdrawn for good cause:

"[THE COURT:] The second one is that the defendant was misled, coerced, mistreated or unfairly taken advantage of. I don't know how the Court gets to those points. There is no allegation of coercion. There's no allegation of mistreatment. And there's no allegation that he was unfairly taken advantage of. The case law says that the defendant knows his own criminal history and is presumed to know his own criminal history. Now, the argument might be said that he was misled, because he thought he was going to get 55 months. Now, that's his perception. The Court at the time of his plea, advised him of the minimum and maximum sentence that could be imposed on a level five felony. So, and the Court told him that that sentence would depend upon his prior criminal history. There's no misleading here. There may have been a misperception on his part, but the Court does not find that he was misled."

### The judge continued by addressing a third factor:

"[THE COURT:] Finally, that the plea was fairly and understandingly made. The Court went through a long list of questions with Mr. Garcia at the time he entered his plea. Explained the ramifications, the rights that he was giving up. The options that he had. And again, went through the potential sentence range that he would be subjecting himself to if he entered a plea to a level five felony. The Court at the time of his plea had no knowledge whether he was an I or an A [criminal history range] or anywhere in between. All this Court knew was that Mr. Garcia was entering a plea to a level five, and that his sentencing range would depend upon his prior criminal history.

"So this Court does not find that there was—that the plea was not fairly and understandingly made."

### After addressing these three factors, the judge continued in relevant part:

"[THE COURT:] Now, the Court will also address the questions raised in *State v. Ford* or the issues.

*"There's no allegation in the motion that this Court has seen, that the defendant is not guilty of the crime that he was convicted of.* He—this allegation is that Mr. Garcia entered a plea. Upon entering the plea, now does not like the presentence investigation and wants to withdraw the plea, because he doesn't like the presentence investigation. That is not a basis and that is not good cause. This Court asked Mr. Garcia at the time of his plea, all of the questions that are required, as this Court is aware of, for the entering of a plea, so that the Court is aware that the plea was knowingly, voluntarily, and intelligently entered with knowledge of the consequences. Mr. Garcia had knowledge of the consequences by the minimum and maximum number of months that he could be sentenced depending upon his prior criminal history, if any. The Court addressed Mr. Garcia personally, and Mr. Garcia answered the Court's questions in the appropriate way as the

record reflects. This Court, also, advised Mr. Garcia that it was not bound by any agreement." (Emphasis added.)

The judge ultimately denied the motion:

"THE COURT: And based upon all [these] reasons, the Court finds that the motion to withdraw his plea for good cause shown is denied and fails. That he has shown no good cause, other than the fact that he is now dissatisfied with the results of the presentence investigation, because it shows that he is a criminal history C instead of a criminal history B. It shows him as to a criminal history B instead of what he thought he would be, a criminal history score C, I'm sorry if I read it backwards. So the motion is denied."

The judge sentenced Garcia to 128 months' incarceration. This was the high figure in the grid box applicable to a defendant guilty of a level 5 felony with a criminal history score of B.

On appeal to the Court of Appeals, Garcia relied principally on *Schow*, arguing that an allegation of innocence is not necessary to a showing of good cause and that a mutual mistake of fact on a criminal history score can be. For its part, the State argued that the district judge's reference to *Ford* did not indicate his imposition of a requirement of an allegation of innocence and that even *Schow* prescribed examination of three factors to determine the existence of good cause: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made. See *Schow*, 287 Kan. at 542; *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006).

A majority of the Court of Appeals panel affirmed the motion denial, holding that Garcia had not established that the district judge based his decision on an incorrect understanding of the law. "[T]he district court did not make an innocence allegation a prerequisite to plea withdrawal." *State v. Garcia*, No. 102,140, 2010 WL 3323813, at *4 (Kan. App. 2010) (unpublished opinion). The majority held that, although the district court cited *Ford*, he simply made a one-sentence observation about the lack of an allegation of Garcia's innocence. In the alternative, the majority said, the lack of an innocence allegation was appropriately included as one factor in the district court's plea withdrawal analysis. The majority distinguished this case from *Ford*, because the district judge had not

ruled that the absence of an innocence allegation was dispositive against the defendant.

Judge Leben dissented. His first basis was the district judge's citation to *Ford* without a citation to this court's later decision in *Schow*. He believed this meant the district judge "operated under a mistaken understanding of the law." *Garcia*, 2010 WL 3323813, at *6 (Leben, J., dissenting).

Second, as Garcia had argued, Judge Leben believed the district judge had not followed other *Schow* dictates. Specifically, the court failed to consider the circumstances giving rise to the "mutual mistake" about Garcia's criminal history score and their effect on the factors contained in *Edgar*, 281 Kan. at 36. Rather, the court simply relied upon the standard warnings it had given before taking the plea: cautionary comments about potential maximums and about the final sentence being determined by Garcia's full criminal history score shown in the presentence investigation report. Judge Leben would have remanded for district court consideration of the motion under the proper legal standards. *Garcia*, 2010 WL 3323813, at *8 (Leben, J., dissenting).

We granted Garcia's petition for review.

ANALYSIS

Generally, a district court's decision to deny a motion to withdraw plea is reviewed for an abuse of discretion. *State v. Freeman*, 292 Kan. 24, 27, 253 P.3d 1 (2011). But Garcia alleges a particular type of abuse of discretion—application of the wrong legal standard. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011). To the extent we review whether the district court's discretionary determination was guided by erroneous legal conclusions, we exercise unlimited review. *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010).

As the party alleging abuse of discretion, Garcia bears the burden of establishing it. *Schow*, 287 Kan. at 541 (citing *State v. Harned*, 281 Kan. 1023, 1042, 135 P.3d 1169 [2006]).

Garcia primarily contends, as did Judge Leben in his dissent, that the district judge may have abused his discretion by relying upon *Ford* to require him to allege his innocence as a prerequisite

to withdraw his guilty plea. Five years after the Court of Appeals' decision in *Ford*, we held to the contrary: "[T]his court does not require an allegation that defendant is not guilty as charged as a prerequisite for withdrawing a plea of guilty or nolo contendere prior to sentencing." *Vasquez*, 272 Kan. at 696. And, more recently, in *Schow*, we reinforced *Vasquez* on this point. Garcia also endorses Judge Leben's dissent in another respect, arguing that the district judge failed to follow *Schow* by considering the circumstances giving rise to a mutual mistake about Garcia's criminal history score. Instead, Garcia asserts, the district judge relied exclusively upon the fact that Garcia received standard warnings given at plea hearings about the instability of predictions of sentencing ranges and a judge's freedom to depart from the parties' recommendations. Accordingly, Garcia asks that this case "be remanded for new consideration of Mr. Garcia's presentence motion to withdraw his plea" under *Schow*.

As before the Court of Appeals, the State responds that the district judge merely used *Ford* to outline the *Edgar* factors and mentioned only in passing that Garcia had not asserted his innocence. The State also asserts that the district judge did follow *Schow*'s remaining rubric for evaluating whether a mutual mistake on Garcia's criminal history compelled withdrawal of his plea. Specifically, the judge conducted a thorough *Edgar*-style analysis that considered the circumstances giving rise to the purported mutual mistake. And, per *Schow*, Garcia had not been misled or induced unfairly to enter his nolo plea because the State had made no assurances as to his criminal history. In the alternative, the State argues that any criminal history mistake was not mutual, but unilateral, because Garcia would have known about his prior juvenile adjudication and failed to inform his counsel, the prosecutor, and the court until after he was confronted with its appearance in his PSI.

The parties are correct that, because Garcia filed his motion to withdraw his nolo contendere plea before sentencing, the district judge had discretion to allow him to withdraw once he had demonstrated good cause. K.S.A. 22-3210(b). Kansas courts generally consider the three "*Edgar* factors" when evaluating whether a de-

fendant has presented the requisite good cause. *Edgar*, 281 Kan. at 36; see *State v. Aguilar*, 290 Kan. 506, 511, 231 P.3d 563 (2010) (citing *Edgar*, 281 Kan. at 36). While the *Edgar* factors are "viable benchmarks for judicial discretion," they should not be mechanically applied and should not be relied on to the "exclusion of other factors." *Aguilar*, 290 Kan. at 512.

On the *Ford* allegation-of-innocence issue, Judge Leben accurately and succinctly articulated Kansas law: "[A] trial judge may *consider* whether the defendant is claiming innocence—such a claim might well support good cause. What the district court can't do is *require* a claim of innocence to withdraw a plea." *Garcia*, 2010 WL 3323813, at *6 (Leben, J., dissenting).

This rule is consistent with the approach in several federal circuits, including the Tenth Circuit. See *United States v. Byrum*, 567 F.3d 1255 (10th Cir. 2009) (factors to consider on motions to withdraw plea before sentencing included "whether the defendant has asserted his innocence"); *United States v. King*, 604 F.3d 125, 139 (3d Cir. 2010) (same); *United States v. Carreto*, 583 F.3d 152, 157 (2d Cir. 2009) (same); *United States v. Rodgriguez-Leon*, 402 F.3d 17, 25 (1st Cir. 2005) (same). It is also consistent with our statement in *Aguilar* that a district court judge may consider all relevant factors, in addition to *Edgar* factors. 290 Kan. at 511.

The problem here is that the district judge's statements at the plea withdrawal hearing—including his explicit reference to *Ford* and his failure to mention *Vasquez* or *Schow*—lead us to the conclusion that he may have given the absence of an allegation of innocence more weight than it deserved. We acknowledge that the district judge also correctly considered the *Edgar* factors, a calculus in which any mutual or unilateral mistake as to Garcia's criminal history score may have been adequately included. See *Schow*, 287 Kan. 529, Syl. ¶ 3. We are simply not reassured enough by the district judge's discussion of the *Edgar* factors so as to discount or disregard the possibly inappropriate emphasis on *Ford* and the absence of an allegation of innocence. As a result, the district judge's decision may have been guided by an erroneous legal conclusion, making the denial of Garcia's motion an abuse of discretion. As we said in *Schow*, "[T]o the extent the district court refused to grant

the motion to withdraw plea based upon an erroneous understanding of the law, *i.e.*, that an allegation of innocence was a prerequisite, the ruling would be an abuse of discretion." 287 Kan. at 541.

Given this uncertainty, we must reverse the district judge's denial of Garcia's motion to withdraw plea and remand for another hearing and apply the appropriate legal standards. The judge must determine under the framework discussed here whether Garcia has made his good cause showing under K.S.A. 22-3210(b) and then exercise his discretion in ruling on the motion. Given this outcome on Garcia's first argument, we do not reach the merits of his second argument on mutual mistake.

Reversed and remanded with instructions.

\* \* \*

ROSEN, J., concurring: I write separately because I believe that a plea should not result in a sentencing hearing that casts Garcia and similarly situated defendants in the role of a game show contestant anxiously wondering what criminal history score will be revealed behind door number one. I have previously thought otherwise about the degree of knowledge required to make a knowing and intelligent plea, but I have come to the conclusion that our statutorily derived procedure of determining criminal history postconviction prevents the defendant from an intelligent understanding of the presumed consequences of the plea. And further, our interpretation of K.S.A. 22-3210(a)(2) makes meaningless the statute's intention of providing the defendant knowledge of the maximum nonchallengeable, nonreviewable, presumptive liberty interest at stake.

Most criminal cases are resolved by a plea. A guilty or nolo contendre plea waives several important constitutional guarantees, including the right against self-incrimination, the right to trial by jury, and the right to confront one's accusers. See, *e.g.*, *State v. Moses*, 280 Kan. 939, 946, 127 P.3d 330 (2006). For that reason, the law requires that a waiver must be knowingly, intelligently, and voluntarily entered. There are numerous motivations for all of the parties in a criminal case to reach resolution by the plea negotiation process. The defendant is waiving constitutional rights in exchange

for understanding the presumptive disposition and limiting the potential duration of the sentence to be imposed, reducing the number of convictions, minimizing the impact on criminal history, or other benefits. Plea agreements spare victims the trauma of testifying and save the State time, expense, and uncertainty of trial. Clearly, our overcrowded courts could not begin to resolve all of the cases in a timely manner if the majority of cases were not settled through plea agreements. Plea negotiations are vital to the function of our criminal courts; however, any shortcut employed in reaching final resolution in these cases must not be at the expense of the heightened constitutional protections demanded in criminal proceedings.

Following our statutorily derived procedure, a defendant's criminal history score is not calculated until after the defendant has been convicted. K.S.A. 21-4714. This procedure makes some sense for completing a final presentence investigation report (PSI), because the PSI includes the current crime or crimes of conviction. But the delay in calculating the defendant's criminal history score for the purpose of completing a PSI compromises the underlying integrity and principles of fair and equitable justice by requiring defendants to waive their constitutional rights without a basic understanding of the consequences of their actions. This statute does not preclude the calculation of criminal history prior to the plea, nor should it be applied in a manner that supersedes the defendant's constitutional rights.

Further, K.S.A. 22-3210(a)(2) requires that, before accepting a plea of guilty or nolo contendere "in felony cases, the court has informed the defendant of the consequences of the plea, including the specific sentencing guidelines level of any crime committed on or after July 1, 1993, *and of the maximum penalty provided by law which may be imposed upon acceptance of such plea.*" (Emphasis added.) This statute recognizes the magnitude of the decision being made, which requires a full understanding of the consequences to the defendant. The statute explicitly requires that the defendant be informed of the maximum lawful penalty that may be imposed.

Without an accurate criminal history score calculated before the plea is accepted, the district court cannot properly inform the de-

fendant of the maximum penalty provided by law. To accept the entire range provided by the sentencing guidelines as the "maximum penalty provided by law" is to ignore the reality of the situation. For example, in this case, Garcia did not enter a plea merely to secure "a level 5" conviction. He entered a plea with the understanding that his expected criminal history score subjected him to a presumptive sentence of 53 to 60 months' imprisonment. Instead, his actual criminal history score more than doubled his presumptive sentence to 114 to 128 months' imprisonment. Reciting the fact that a level 5 conviction has a minimum sentence of 31 months and a maximum sentence of 136 months, depending on criminal history, does nothing more than repeat the fact that the defendant is entering a plea to a level 5, nondrug felony. This range encompasses the actual maximum penalty provided by law but does not inform the defendant of the actual applicable maximum penalty. The statutorily required "maximum penalty provided by law" is one that can, and should, be calculated before the defendant enters a plea of guilty or nolo contendere.

The Kansas Sentencing Guidelines Act (KSGA) K.S.A. 21-4701 *et seq.*, provides detailed and specific methods for determining the sentence applicable to any particular crime or group of crimes, that is, the "maximum penalty provided by law." The intersection of the severity level of the current crime of conviction and the defendant's criminal history score provides a presumptive sentence. If the defendant has been convicted of more than one crime, other provisions, such as the double-double rule, further define the maximum sentence that the district court can impose. At a minimum, the defendant should have this information before entering a plea that is considered knowing and voluntary.

Requiring no more than the recitation of the potential sentencing range based solely on a crime's severity level does not provide for a sufficient understanding of the potential consequence of the voluntary waiver of the right to trial. "Knowingly and intelligently" implies having the knowledge and being able to apply that knowledge to one's decision. Being compelled to make such a critical decision without a basic understanding of the consequences precludes the exercise of an intelligent choice. A knowing and vol-

untary waiver of this important constitutional right requires that the defendant have the applicable knowledge and the information necessary to apply that knowledge to his or her decision. I now believe that the manner in which the law has been applied to these situations precludes the full exercise of the concept of a knowing and intelligent choice.

Some may argue that employing a procedure that reveals criminal history at the plea stage somehow limits the sentencing court's discretion in imposing sentence. The sentencing court's power to impose sentence is governed by the KSGA, not by the timing of when criminal history is gathered and disclosed. Neither the State, nor defendant's counsel, nor the defendant may bind the district court to any ultimate imposition of sentence stated during the plea stage; the court always maintains the discretion to depart on duration and/or disposition, utilization of jail sanctions, and in multiple conviction scenarios, imposition of concurrent or consecutive sentences. However, disclosure of the criminal history allows for a determination of the presumptive sentence for each crime in which a plea is entered, and the presumptive sentence is where the required recitation of any potential sentence should commence. The imposition of a presumptive sentence is not appealable and is the starting point from which the court will ultimately impose the controlling sentence. The presumptive sentence and any accompanying sentencing rules are an important piece of the defendant's knowing and voluntary plea. Providing this information complies with Kansas law by disclosing the actual maximum penalty which may be imposed and gives the defendant a reasonable expectation of what lies ahead upon that entry of a plea.

While I agree with the dissent in concluding that there was no uncertainty as to whether the district court required Garcia to allege his innocence as a prerequisite to withdrawing his plea, I cannot follow the dissent's public policy argument regarding the defendant's disclosure of prior convictions. It has never been the duty or obligation of a criminal defendant to provide his or her criminal history. Further, to expect any citizen who is not law trained, let alone familiar with the KSGA, to self-determine criminal history is unrealistic and contrary to the burdens that are placed on the State

in criminal proceedings. The dissent's concern of trickery or purposeful concealment of prior crimes by deceitful defendants is eliminated by disclosure of their criminal history prior to entering a plea.

From this point forward, I would require a criminal history determination, which is to be used at any subsequent sentencing hearing, to be part of the plea agreement. In that respect, I would adopt the procedural suggestions made in Dyer, *Revising Criminal History: Model Sentencing Guidelines §§ 4.1-4.2*, 18 Fed. Sent'g Rep. 373, 377 (2006). The gathering of criminal history information and the computation of a criminal history score are merely issues of timing. While I realize this requirement compels a shifting of resources not heretofore demanded, whatever inconvenience suffered by those required to assemble this information before the plea hearing should not stand as an obstacle to justice in light of the critical nature of this determination. Therefore, I would reverse and allow Garcia to withdraw his plea. And because Garcia would possess the knowledge of his criminal history, he could then knowingly and intelligently proceed accordingly.

*　*　*

JOHNSON, J., concurring: Although I believe that the record before us would support a finding of good cause to grant Garcia's presentence motion to withdraw plea, I am comfortable joining the majority's decision to remand the case to permit the district court to rule on the motion in the first instance, utilizing the correct legal standards in the exercise of its judicial discretion. But I disagree with the majority's declaration that the district court "correctly considered the *Edgar* factors," if that statement is intended to imply that the district court's analysis of those factors comported with the letter and spirit of our decision in *State v. Schow*, 287 Kan. 529, 197 P.3d 825 (2008). The only aspect of the district court's handling of the *Edgar* factors that I would label as "correct" is its identification of the three factors. 287 Kan. at 534. Further, while I agree with Justice Rosen's assessment of what should happen in the future, I will address what I believe should happen here on remand.

In *Schow*, everyone at the plea hearing believed that the defendant had a criminal history score of D which would have placed him in a presumptive probation grid box. Before sentencing, the presentence investigation report (PSI) revealed three misdemeanors that were subject to aggregation into an additional felony to make a criminal history score of B and place Schow in a presumptive prison grid box. Schow's attorney withdrew, and replacement counsel moved to withdraw the plea. The district court denied the motion, and the Court of Appeals pronounced that, as a matter of law, a mutual mistake as to the defendant's criminal history score could not be the basis for good cause to withdraw a plea. *State v. Schow*, 37 Kan. App. 2d 941, 161 P.3d 222 (2007).

On review, this court rejected the Court of Appeals' purported rule of law, suggesting that no special rule was necessary for a mutual mistake of criminal history score. Rather, the mistake is simply a fact or circumstance to be plugged into the court's analysis of the *Edgar* factors. We specifically said that "the circumstances giving rise to the mistake [about defendant's criminal history score] may well implicate the *Edgar* factors and should be available for consideration by the court." 287 Kan. at 543. Moreover, we clarified that "good cause" and "manifest injustice" are not the same inquiry, *i.e.*, the defendant does not have to establish manifest injustice to show good cause. 287 Kan. at 540-41.

Later, in *State v. Aguilar*, 290 Kan. 506, 512, 231 P.3d 563 (2010), we reiterated that good cause is a lesser standard than manifest injustice. As such, a defendant need not establish manifest injustice to show good cause. We also pointed out that the statute provides that a good cause plea withdrawal is " '*within the discretion of the* court' "; that "[a] district court has no discretion to fail to remedy a constitutional violation"; that, therefore, "[i]t is neither logical nor fair to equate the lesser K.S.A. 22-3210(d) good cause standard . . . to the high constitutional burden"; and that "[t]he *Edgar* factors do not transform the lower good cause standard . . . into a constitutional gauntlet." 290 Kan. at 513. In other words, Garcia was not required to show a violation of his constitutional rights in order to establish good cause to withdraw his plea.

Providing further guidance to the trial bench, *Aguilar* warned against a mechanical application of the *Edgar* factors and clarified that "[a]ll of the *Edgar* factors need not apply in a defendant's favor in every case, and other factors may be duly considered in the district judge's discretionary decision on the existence or non-existence of good cause." 290 Kan. at 513. In some cases, "lack-luster advocacy" by defendant's attorney could be enough to clear the good cause hurdle. 290 Kan. at 513. *Aguilar* remains good law in this State, and we have not been asked to revisit it here.

Turning to the district court's analysis in this case, the record suggests that the court mechanically and superficially applied the three *Edgar* factors, without relating them to the defendant's mistaken belief that his plea would result in a 55-month prison sentence. For instance, with respect to the first factor—whether the defendant was represented by competent counsel—the majority quotes the trial judge as stating that he was "well aware of the experience and the ability of [plea hearing defense counsel] as an attorney to represent defendants in criminal matters. And [the district judge] has no doubt about the competence of [plea hearing defense counsel]." The district court seemed to be reading the first *Edgar* factor as simply requiring the district court to determine whether the defendant's counsel possessed a general reputation for competency in criminal defense law, as demonstrated by the attorney's past performance. But, of course, finding that an attorney is generally recognized as being a competent criminal defense lawyer does not answer the question of whether the attorney provided lackluster advocacy or gave incompetent advice with respect to the particular plea sought to be withdrawn.

Although the recitation of the first factor might be read quite literally to mean a general reputation for competency, that is obviously not what was intended. In the first instance, if a defendant were to be represented by an attorney who is generally recognized to be *incompetent* in the area of criminal defense, the district court would be faced with a patently obvious and fundamental problem that would transcend any question of "good cause." In that event, the defendant would be denied his or her constitutional right to effective assistance of counsel, as well as his or her constitutional

right to due process of law, rendering the resulting plea invalid and subject to being set aside without the necessity of considering any discretionary factors, *Edgar* or otherwise.

Moreover, even a cursory reading of *Schow* confirms that *Edgar*'s first, competency-of-counsel factor was intended to be an analysis of the defense attorney's performance as it specifically relates to the defendant's plea. There we said:

"With respect to the first factor, the Court of Appeals stated that the record did not suggest that Schow was not represented by competent counsel. To the contrary, we find that the record raises a number of questions. An initial indication of performance problems might be found in the fact that defense counsel felt compelled to withdraw from the case in order to try to protect Schow's interests. Next, the current PSI indicated that the information about the Florida misdemeanors, which raised the criminal history score above that used in the plea bargain, was obtained from a prior PSI from the same district court. One might wonder whether it was reasonable for defense counsel to rely upon the State's representations of the number and severity level of prior convictions, when verification could be obtained from the court's record. Furthermore, in order to reach the higher score, the misdemeanors had to be aggregated and converted into a person felony, prompting a question as to whether the current mistake was prompted by counsel's failure to know or to apply the current sentencing guidelines." *Schow*, 287 Kan. at 543-44.

Similarly, here, some obvious questions come to mind: whether plea hearing counsel asked Garcia about juvenile adjudications while discussing criminal history with his client and, if not, whether the failure to inquire was due to a belief, shared by his client, that juvenile adjudications were not part of the calculus; whether counsel performed his own calculation of the criminal history score or simply accepted the client's assessment; and whether counsel investigated the existence of a readily available prior PSI or other documentation to confirm the facts relevant to Garcia's criminal history. Also, it would be interesting to know whether the juvenile adjudication was omitted from the criminal history scoring in Garcia's prior adult cases, so as to corroborate his belief that the adjudication just did not matter. Granted, the district court found that Garcia was not challenging the competency of his plea hearing counsel. However, the court apparently misconstrued the grava-

men of the first factor, and upon remand, the arguments on this factor may well be different.

Moving to the second *Edgar* factor, the district court analyzed it in the context of the in-court recitations at the plea hearing. After noting that Garcia had made "no allegation of coercion . . . no allegation of mistreatment . . . no allegation that he was unfairly taken advantage of," the court declared that a defendant is presumed to know his own criminal history and that Garcia's belief that he was going to get 55 months was simply "his perception." As Justice Rosen suggests in his concurrence, it is unrealistic and contrary to the allocation of the burden in criminal cases to expect a defendant to know the legal consequences of his or her prior convictions or adjudications. For instance, K.S.A. 21-4710(d)(4) provides that certain juvenile adjudications "will decay if the current crime of conviction is committed after the offender reaches the age of 25." In my view, a defendant should be able to rely on defense counsel to inform him or her as to how K.S.A. 21-4710(d)(4) and other sentencing guideline provisions apply to the defendant's unique circumstances. Not the other way around.

The district court went on to say that, at the time of the plea, it had advised Garcia of the minimum and maximum sentences that could be imposed on a level five felony and had advised Garcia that the sentence would depend upon his prior criminal history. The court concluded: "There's no misleading here. There may have been a misperception on his part, but the Court does not find that he was misled." Apparently, the district court was refuting any notion that the judge presiding at the plea hearing had misled the defendant as to his criminal history score or the applicable grid box sentence, albeit Garcia was not making that claim.

According to Garcia, he did, in fact, have a misperception of the benefit he was to receive from the plea bargain; he thought he would receive a 55-month sentence. That misperception was corroborated by the discourse between defense counsel and the prosecutor, as related by the prosecutor: Defense counsel said, " 'We can send him for 55 months,' " and the prosecutor responded, " 'That sounds fine.' " If the attorneys, rather than correcting the defendant's misperception of the applicable sentence, use the de-

fendant's perceived sentence term of 55 months in their plea bargain discussions, one might well find that the defendant was misled to believe that he had correctly scored his criminal history. The district court should have pursued that inquiry.

Further, I agree with Justice Rosen's assessment that advising a defendant of the sentencing range for the crime severity level applicable to a particular defendant is not enough. The fact that the court recited that the severity level 5 sentence for a criminal history of I is 31 months and the sentence for a criminal history of A is 136 months, neither of which was applicable in this case, did nothing to cure the defendant's misunderstanding that he would fall within criminal history category C and get a mid-range sentence of 55 months. If a buyer of a mid-range automobile has been led to believe that the vehicle will get 30 miles per gallon of gasoline (mpg), but it actually was rated for 20 mpg, the buyer is not comforted after the purchase by being reminded that the salesman had told the buyer that the dealer had a hybrid on the lot that gets 48 mpg and a large pickup truck that gets 14 mpg. Here, Garcia thought he was buying the mid-range criminal history score and it does not follow logically that such a mistaken belief would be dispelled by being advised that other defendants with other criminal history scores would get other sentences.

Moreover, the district court is not making the recitation of the applicable maximum sentence to resolve any misperceptions the defendant may have about his actual criminal history score. Rather, in felony cases, the court is required to inform the defendant "of the maximum penalty provided by law which may be imposed upon acceptance of such plea." K.S.A. 22-3210(a)(2). Such advice is a matter of constitutional necessity and not a prophylactic measure for the court to later use to prevent the defendant's proof of good cause for plea withdrawal. See *State v. Anziana*, 17 Kan. App. 2d 570, Syl. ¶ 2, 840 P.2d 550 (1992) ("Compliance with the requirements of K.S.A. 22-3210 is essential to protect a defendant's rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.").

In short, the district court should consider whether Garcia was misled by circumstances occurring outside the courtroom, as he

explicitly said that he was. In analyzing this factor, I do not believe that the district court should be bound by the dissent's characterization of the exchange of information between attorney and client. The dissent repeatedly declares that Garcia "intentionally withheld" from his attorney the information about his old juvenile adjudication that occurred when Garcia was 12 years old. In my view, intimating that Garcia intentionally misled his own attorney is unwarranted. Garcia said that he did not share the information because he did not believe that it mattered, not because he intended to deceive or mislead his attorney. I suspect that Garcia might have also failed to share with his attorney information about any detentions he might have received at middle school for being tardy or misbehaving in class. Would that failure to share an immaterial fact also be characterized as an intentional withholding of information?

Likewise, the inquiry is not whether the prosecutor guaranteed or assured Garcia that he would receive a 55-month sentence. If the 55-month sentence had been part of the plea agreement, the prosecutor would have breached the agreement by arguing against that prison term. See *State v. Woodward*, 288 Kan. 297, Syl. ¶ 3, 202 P.3d 15 (2009) (State can breach plea agreement by effectively arguing against the negotiated sentencing recommendation). In that event, our United States Supreme Court has said what the district court is to do: It must decide whether justice requires that the State's promise be fulfilled or whether the defendant should have the chance to withdraw the plea. *Santobello v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971). That action is required, separate and independent of the good cause provision or even the manifest injustice provision of K.S.A. 22-3210(d). In other words, good cause does not require the defendant to prove that the State breached the terms of the plea agreement.

Moreover, if the prosecutor commits the tort of misrepresentation as the dissent would require Garcia to prove here, one would have to say that the ensuing plea was the product of manifest injustice, rather than good cause. Again, good cause does not require the defendant to prove that the State engaged in tortious conduct.

With respect to the third *Edgar* factor—the plea was fairly and understandingly made—the district court again focused on what it

had said to Garcia at the plea hearing. The court recited that it had advised Garcia of the rights he was giving up with the plea and his options; and that it went through the potential sentence range for a level five felony. The court then stated that it had no knowledge of Garcia's criminal history score, but rather it only knew that Garcia was pleading to a level five felony.

Again, in my view, the court missed the point. The analysis of whether the defendant understandingly entered the plea must focus on what the defendant knew, not on what the presiding judge knew. Moreover, the knowing and intelligent nature of the plea is not driven so much by the defendant's knowledge of the rights that every defendant must waive in order to plea as it is by the defendant's belief as to the benefit he or she will acquire in the case at hand in return for those waivers.

Here, Garcia said he believed he would receive a 55-month sentence if he pled. Nothing in the record suggests to me that anyone refuted that such was Garcia's belief, nor did the district court find Garcia's statement of belief to be incredible. To the contrary, the district court said "that's his perception." If that is what Garcia perceived, that is what he understood, and correspondingly, that is what kept his plea from being understandingly made. The district court appeared to reject the notion that the inquiry was subjective. But, as Justice Rosen explains, "knowingly and intelligently" means that this particular defendant had actual knowledge and was able to apply that knowledge in making the plea decision. Therefore, once the district court found that Garcia was mistaken about the sentence he would receive for his plea, it should have included that factor in the analysis.

One final observation on the good cause analysis: *Aguilar* instructed that the district court should consider any fact or circumstance that would impact the good cause determination. 290 Kan. at 513. The majority and dissent suggest that the absence of a claim of innocence can be such a factor. Without conceding that point, I would point out that Garcia has never admitted that he committed the charged offenses. He pled nolo contendere, which is not an expression of guilt. See *State v. Case*, 289 Kan. 457, Syl. ¶ 3, 213 P.3d 429 (2009). Granted, a no contest plea *is* not technically

the same as an affirmative protestation of innocence which might occur in an *Alford* plea. See *Case*, 289 Kan. at 460-61. Nevertheless,

" '[t]he basic premise behind [a no contest plea] is that "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he [or she] is unwilling or unable to admit his [or her] participation in the acts constituting the crime.' " 93 Minn. L. Rev. at 730 (quoting *Alford*, 400 U.S. at 37)." *Case*, 289 Kan. at 461.

Certainly, the fact that Garcia chose to plead nolo contendere gives some credence to the notion that he was pleading because he could cut his losses to a 55-month prison term, rather than because he was guilty.

Even though it will not impact the case on remand, I cannot end without addressing my concerns with the dissent's public policy discussion. First, the dissent speaks to defendants who would "withhold criminal history information." Notwithstanding a criminal defendant's constitutional right against self-incrimination, the word "withhold" is statutorily misleading. Under the sentencing guidelines, " 'the State has the burden to prove a defendant's criminal history unless the offender admits his or her criminal history in open court.' " *State v. Tolliver*, 22 Kan. App. 2d 374, 380, 916 P.2d 725 (1996) (quoting *State v. Hankins*, 19 Kan. App. 2d 1036, 1047, 880 P.2d 271 [1994]). Further, "there is no provision in the KSGA which *requires* a defendant to come forward and provide the State with an accurate criminal history." 22 Kan. App. 2d at 381. In fact, even if the defendant provides false information, there is no implicit rule that sentencing proceedings are tainted by that misinformation. 22 Kan. App. 2d at 381. Accordingly, rather than speaking about defendants who *withhold* criminal history information, the dissent might be more accurate to refer to defendants who decline to *volunteer* criminal history information when they are not statutorily, or perhaps constitutionally, required to do so.

Besides my quibbling about semantics, I join with Justice Rosen in having concerns about the dissent's description of the potential for defendant gamesmanship with plea withdrawals. Often, because the parties cannot control sentencing through their agreement, a plea bargain will involve the dismissal of some counts, the

reduction of crime severity through a complaint amendment, or an agreement not to file another case that is pending. If the defendant successfully withdraws his or her plea prior to sentencing, the defendant can expect that the State will return to prosecuting the defendant to the maximum permitted by law, sometimes adding counts that were not in the original complaint. In the dissent's vernacular, upon plea withdrawal, the defendant must give back the cake without eating so much as one bite.

This case is spot on with the foregoing description of what often happens. Garcia was originally charged with attempted second-degree murder and severity level 4 intentional aggravated battery, as well as having charges pending in another case. The murder charge was dismissed, the aggravated battery charged was reduced to the reckless version at severity level 5, and the other charges in the pending case were dropped. If Garcia is successful in withdrawing his plea, he most likely will find himself facing the original charges, with the potential for a great deal longer prison sentence. Indeed, rather than chastising Garcia for manipulative behavior, one might be moved to caution him: Be careful what you wish for.

In summary, I would have the district court reassess the *Edgar* factors in the context of the misunderstanding on criminal history score, as well as have the district court consider any other factors germane to the good cause determination. In that regard, I would direct that the district court apply the good cause test as a less stringent standard than both manifest injustice and a constitutional violation. In other words, good cause to withdraw a plea prior to sentencing involves something less than a violation of the defendant's constitutional rights and creates a circumstance that is something less than manifest injustice.

\* \* \*

NUSS C.J., dissenting: I respectfully dissent. Specifically, I disagree with the majority's conclusion that it is uncertain whether the district court required Garcia to allege his innocence as a prerequisite to withdrawing his plea per *State v. Ford*, 23 Kan. App. 2d 248, 930 P.2d 1089 (1996) overruled by *State v. Schow*, 287 Kan. 529, 197 P.3d 825 (2008). The court clearly did not.

I start by placing the references to *Ford* in context. First, *Ford* was not referenced in any of the parties' pleadings with their attached memoranda of law. Rather, both parties listed three elements for the court to consider—which we recognize as the so-called *Edgar* factors. They then argue only about whether these three factors—and no others—have been met.

According to the record on appeal, the first reference to *Ford* was at the hearing on Garcia's motion to withdraw his plea. After Garcia's counsel argued the three factors of analysis for good cause to withdraw his plea, the State addressed these same factors and argued that *State v. Haskins*, 262 Kan. 728, 942 P.2d 16 (1997), was on point.

"[PROSECUTOR:] I do believe that *State v. Haskins* is on point. It says, 'defendant who knowingly entered into a guilty plea to aggravated battery charge, even though the defendant and the State were mistaken about the defendant's criminal history score at the time of plea and sentence was imposed on more serious criminal history, was discovered before sentencing.' Then he files this motion to withdraw. And based upon that, they said he shouldn't be able to withdraw that."

The prosecutor immediately continued:

"[PROSECUTOR:] *State versus Ford*, 23 Kan. App. 2d, is very similar to this. In *Ford*, at the time of the plea, both the prosecutor and the defense counsel believed that the defendant had only one prior person felony. However, the defendant's PSI report subsequently revealed he had two prior person felonies, which removed the possibility of the defendant receiving presumptive probation. The defendant moved to withdraw his plea prior to sentencing, and the District Court denied the motion. This happens. The Court is bound by K.S.A. 21-4707, to use prior convictions that are discovered. And the court has to sentence this defendant upon his true criminal history."

The parties made no other reference to *Ford*. Plainly, *Ford* was mentioned by the prosecutor only for its alleged factual similarity to *Haskins* and Garcia's situation. It was not mentioned for the absolute requirement of an allegation of defendant's innocence.

The district court referred to *Ford* twice. It began its entire withdrawal analysis by properly citing *Ford* as proof of its familiarity with the issues and authority to consider what were later labeled the *Edgar* factors:

"THE COURT: Well counsel, I've read both briefs and I've dealt with these motions on a number of occasions in the past. You know, one of the cases that the Court has looked at and was cited by the State, was *State v. Ford*, 23 Kan. App. 2d, 248. And the Court's well aware of the issues on a motion to withdraw for good cause and the considerations of one [factor that], the defendant was represented by competent counsel. . . . The second one is that the defendant was misled, coerced, mistreated or unfairly taken advantage of. . . . Finally, that the plea was fairly and understandingly made."

The court then examined each *Edgar* factor and concluded that Garcia failed to meet any of them. The court correctly found it undisputed that Garcia was not presenting an argument under the first *Edgar* factor—competency of counsel. For the second *Edgar* factor, the court expressly found that Garcia was not misled, co-erced, mistreated, or unfairly taken advantage of, *e.g.*, "the Court does not find that he was misled." For the third *Edgar* factor, the court expressly stated, "So this Court does not find that there was— that the plea was not fairly and understandingly made."

After completing this *Edgar* analysis, the district court imme-diately proceeded with its second reference to *Ford*:

"Now, the Court will also address the questions raised in *State v. Ford* or the issues.

*"There's no allegation in the motion that this Court has seen, that the defendant is not guilty of the crime that he was convicted of.* He—*this* allegation is that Mr. Garcia entered a plea. Upon entering the plea, now does not like the presentence investigation and wants to withdraw the plea, because he does not like the pre-sentence investigation. That is not a basis and that is not good cause." (Emphasis added.)

For several reasons I conclude the district court cited *Ford* only to focus its analysis. The court simply clarified what Garcia was *not* arguing, *i.e.*, that he was innocent—because an allegation of in-nocence is a factor which everyone concedes may be legitimately considered by a trial court in a plea withdrawal analysis as long as it is not determinative. See, *e.g.*, *United States v. Byrum*, 567 F.3d 1255 (10th Cir. 2009). Accordingly, innocence could be eliminated from the district court's withdrawal analysis. And it was—just like the court eliminated the first *Edgar* factor of defense counsel's competence from its analysis.

For my first reason, I point out that the *actions* of the district court demonstrate its elimination of the innocence factor and consequent narrowing of its focus. Specifically, if the court cited *Ford* to establish the absolute requirement of an allegation of innocence, then after correctly finding Garcia had not so alleged, its analysis was simple. And done. Failure to allege innocence alone mandated denial of the motion. *Ford*, 23 Kan. App. 2d at 251 (motion should allege defendant not guilty). Yet the district court thoroughly analyzed the traditional *Edgar* factors before citing *Ford*. And it performed additional, non-innocence-based analysis afterward. *Cf. State v. Aguilar*, 290 Kan. 506, 231 P.3d 563 (2010) (*Edgar* factors not exclusive).

For my second reason, I point out that the *language* of the district court also demonstrates this innocence factor elimination and its narrowing of focus. The court simply analyzed what it identified as Garcia's only argument. More particularly, the court determined that after Garcia entered his plea, he wanted to withdraw it solely "because he doesn't like the presentence investigation. *That* is not *a* basis and *that* is not good cause." (Emphasis added.)

Any doubt is erased by the district court's reiteration of this elimination of the allegation of innocence factor and attendant focusing when it ultimately denied Garcia's motion. No mention whatsoever is made of a failure to allege innocence. Instead, the court held that Garcia merely was dissatisfied with his PSI:

"THE COURT: And based upon all [these] reasons, the Court finds that the motion to withdraw his plea for good cause shown is denied and fails. That he has shown no good cause, other than the fact that *he is now dissatisfied with the results of the presentence investigation, because it shows that he is a criminal history C instead of a criminal history B. It shows him as to a criminal history B instead of what he thought he would be, a criminal history score C, I'm sorry if I read it backwards*. So the motion is denied." (Emphasis added.)

In summary, Garcia's guilt or innocence clearly was not a factor in the district court's plea withdrawal analysis. Because there is no uncertainty about the correctness of the legal conclusion by which the court was guided, there is no need to reverse and remand. The court simply did not abuse its discretion in denying Garcia's motion

to withdraw his plea. So I would affirm the district court and the Court of Appeals majority on this issue.

Because I would affirm on the first issue, unlike the majority I must now address the second. I agree with the State that the district court essentially followed the direction provided in *State v. Schow*, 287 Kan. 529, 197 P.3d 825 (2008). Specifically, the court conducted a thorough *Edgar*-style analysis that effectively included consideration of the circumstances giving rise to the alleged mutual mistake. And per that analysis directed by *Schow*, Garcia had not been misled or induced, *e.g.*, the State simply had made no assurances as to his criminal history score. Instead, it was Garcia who intentionally withheld material information about his criminal history from the State, the court, and his own counsel. His omission of a prior juvenile adjudication was not by accident, oversight, or negligence but was a decision purposely made by Garcia.

A review of *Schow* is in order. There, Schow appealed the denial of his presentence motion to withdraw his guilty plea based on mutual mistake as to his criminal history score. This court reversed and remanded for the district court to apply the correct standards for establishing good cause to withdraw a plea. During our analysis, several important points were confirmed or established.

First, as previously noted, we confirmed that an allegation of innocence per *Ford* is no longer a prerequisite to granting a motion to withdraw plea. *Schow*, 287 Kan. at 541. Second, a mutual mistake about the defendant's criminal history, standing alone, is insufficient reason as a matter of law to permit a plea withdrawal. As we stated: "We concur that a defendant cannot meet his or her good cause burden by merely declaring that the parties were mutually mistaken about the defendant's criminal history score." 287 Kan. at 543. Third, neither should the motion necessarily be denied when the defendant solely declares a mutual mistake about criminal history. 287 Kan. at 543 (noting Court of Appeals apparently did so). Rather, "the circumstances giving rise to the mistake may well implicate the *Edgar* factors and should be available for consideration by the court." 287 Kan. at 543.

The *Schow* court then analyzed the *Edgar* factors in its review of the circumstances giving rise to the mutual mistake. Because

Garcia, his plea withdrawal counsel, and his appellate counsel all have expressly disclaimed questioning his original counsel's competence, of particular relevance to his case are the *Schow* court's treatment of the second and third factors.

For the second *Edgar* factor of whether "defendant was misled, coerced, mistreated, or unfairly taken advantage of," the *Schow* court talked of Schow being misled or being induced because of assurances. It stated that the correct

"inquiry is whether Schow was *misled* about his criminal history score or was *induced* to enter a plea because of *assurances* that his criminal history score was D [instead of higher]. Any caveats in the written [plea] agreement or in the judge's recitation at the plea hearing might well be germane to the question of whether Schow had actually been *misled or induced*, but they need not be determinative." (Emphasis added.) 287 Kan. at 544.

The court continued to address whether Schow was being misled or being induced because of assurances in considering this second *Edgar* factor:

"If a defendant is given *assurances* about his or her criminal history score which are based upon known facts, any caveats about what might happen if the score is different would be ineffectual to countermand those *assurances*. For instance, the disputed misdemeanors in this case were contained in the PSI of a prior case, yet they were apparently not aggregated in that prior case to score as a felony. The district court might well find that Schow was *misled* into believing the same misdemeanor convictions would receive the same legal treatment in the current case as they received in the prior case, *i.e.,* that they would not increase the criminal history score." (Emphasis added.) 287 Kan. at 544-45.

For the third *Edgar* factor of whether "the plea was fairly and understandingly made," the *Schow* court looked to the State's assertions and assurances of defendant's criminal history. It stated:

"For the third factor, the Court of Appeals found Schow's plea to be fairly and understandingly made because the district court advised him of his maximum sentence; the district court informed him that the sentencing court was not bound to the State's recommendation of probation; and the district court was aware that Schow's counsel separately conveyed this information to Schow, to which Schow replied, 'Yes, your honor, that is fine.'
"If Schow reasonably believed the *assertions* of the prosecutor and defense counsel that his criminal history score *was* D, it is difficult to intuit what enlightenment Schow would find in the court's recitation of the maximum sentence which could be imposed upon a defendant with a score of A [15-17 months]. This

is especially true where the district court specifically recited the grid box range for a criminal history score of D. [11-13 months, presumptive probation]

"Moreover, any statement that the sentencing court would not be bound by the State's recommendation of probation would have been misleading, at best. As noted previously, except for filing a motion for departure, the State has no influence on whether a defendant who falls within a presumptive probation grid box is sentenced to probation; the guidelines mandate that sentence. Furthermore, in this instance, the district court specifically told Schow that, if his score was D, he was 'pretty much *assured* of . . . getting probation initially because that will be what the sentencing guidelines tell me to do.' " (Emphasis added.) 287 Kan. at 545.

I begin my analysis by reiterating that because Garcia is the party alleging abuse of the court's discretion in denying his motion, he has the burden to establish the abuse. *Schow*, 287 Kan. at 541. But as explained below, he has not shown, with required cites to the record on appeal, any evidence "to establish that he was misled about his criminal history score or was induced to enter a plea because of assurances that his criminal history score was" C instead of B. *Schow*, 287 Kan. at 544; see *State v. Bryant*, 285 Kan. 970, 980, 179 P.3d 1122 (2008) (appellant's obligation to provide an adequate record on appeal and to direct appellate court with specific references within such a record).

The record on appeal does unquestionably establish, however, the court notified Garcia that his eventual sentence would depend upon his criminal history—which the court did not yet know:

"[THE COURT:] Mr. Garcia, *without knowing your prior criminal history* with the aggravated charge being a level five person felony, if you are convicted, you can be sentenced from 31 months to 136 months in the custody of the Secretary of Corrections and fined up to $300,000 depending upon your financial condition. Do you understand?
"[THE DEFENDANT:] Yes sir." (Emphasis added.)

The sentencing range of 31-136 months that the court described to Garcia corresponds to a severity level five person felony—with either a criminal history score of "I" (minimum 31 months) or a score of "A" (maximum of 136 months). See K.S.A. 21-4704 table. So unlike the defendant in *Schow*, any Garcia argument that the court's mention of a narrow sentencing range induced him to reasonably believe he would be sentenced per that specific grid box

would be completely without factual support. See *Schow*, 287 Kan. at 531, 545.

In continuing with my opinion that there is no evidence "to establish that Garcia was misled about his criminal history score or was induced to enter a plea because of assurances that his criminal history score was" C instead of B, I point to his counsel's factual concessions at oral arguments before this court. She candidly admitted that Garcia did not tell his counsel about the juvenile adjudication. This is a wise concession because in Garcia's amended motion to withdraw his plea, he repeatedly admitted he intentionally withheld this information. And that motion effectively admitted his "C" criminal history score was strictly his "impression," *e.g.*:

"With the Defendant taking the position that he had one person felony and one nonperson/drug felony conviction, *he was of the impression that he would be in category C.*" (Emphasis added.)

Similarly, at Garcia's plea withdrawal hearing, his testimony establishes that his criminal history score and sentence were strictly his "impression," his independent "understanding," and his "thinking." Two examples suffice:

"[DEFENSE COUNSEL:] And at the time of entering this plea, what was *your impression or what was your understanding* of the time that you would serve in the Department of Corrections?

"[THE DEFENDANT:] That I was going to get 53 to 60 months.

. . . .

"[DEFENSE COUNSEL:] And when you entered the plea negotiations, *what was your impression or what did you think counted as convictions or what did you think counted towards your criminal history?*

"[THE DEFENDANT:] Just my adult convictions [one for criminal threat, the other for attempted possession]." (Emphasis added.)

Absolutely no evidence was provided at that hearing to suggest that he was induced by assurances or was misled by anyone. Indeed, on cross-examination by the State, Garcia admitted that the plea-accepting court had told him it was not bound by any plea agreement. He also admitted that after the court advised him of the minimum and maximum sentence it told him the length of his future sentence depended upon his criminal history—which was unknown. Yet he still entered his nolo contendere plea.

Garcia's counsel summarized Garcia's testimony by arguing "he was misled in the sense that he thought [only] criminal convictions would count." But the court made a direct finding that Garcia had not been misled about his sentence of 55 months and, by implication, about the criminal history score that would produce such a sentence. The court expressly found that it had "told him that that sentence would depend upon his prior criminal history" so "[t]here's no misleading here." It concluded, "There may have been a misperception on his part, but the Court does not find that he was misled."

This court finding is amply supported by the record on appeal. Garcia admits he was aware of his prior juvenile adjudication but that he intentionally withheld this information from his counsel. There is nothing in the record showing that Garcia mentioned it to the prosecutor, or the court. Nor is there anything in the record to suggest that they had any independent knowledge of his juvenile adjudication—which is the basis for the later increases in his criminal history score and sentence. Consequently, they could not have misled him, *e.g.*, by their misrepresentations about either his score or his sentence, because even the mildest form of misrepresentations require (1) false information that is (2) relied upon. This court has recognized that under Sec. 552 of Restatement (Second) of Torts (1976), the tort of negligent misrepresentation requires justifiable reliance upon false information supplied by another. *Mahler v. Keenan Real Estate, Inc.,* 255 Kan. 593, 604, 876 P.2d 609 (1994). There, we cited with approval *Bevins v. Ballard,* 655 P.2d 757, 763 (Alaska 1982), for the proposition that even innocent misrepresentation under Sec. 552(C )(1) requires reliance upon material misrepresentation.

If Garcia was misled, he misled himself—if that is linguistically possible. The American Heritage Dictionary of the English Language 839 (1981) defines "mislead" as "to lead or guide in the wrong direction; to lead into error or wrongdoing in action or thought; influence badly; deceive." Equally as important, he misled his own counsel and, by derivation, the prosecutor and the court. The First Circuit Court of Appeals described a similar plea hearing

situation where a defendant withheld some of his criminal history information:

"[T]he appellant was in a far better position than either the prosecutor or the court to supply the missing integer in the sentencing equation; his prior criminal record. Under these circumstances, the appellant cannot claim to be unfairly surprised that his hopes were dashed." *United States v. Torres-Rosa*, 209 F.3d 4, 10 (1st Cir. 2000).

Allowing Garcia to withdraw his plea under such circumstances would also create poor public policy. Defendants would be highly motivated to withhold criminal history information from their counsel, the State, and the court in the hope that the later PSI would not reveal certain adjudications or convictions and therefore would result in lesser sentences. And then if the PSI did reveal those past crimes, the defendant would declare a mutual mistake on criminal history and be allowed to withdraw the plea on that basis. The defendant would have his or her cake and eat it too.

The district court not only specifically rejected any argument about Garcia being misled, but it also essentially rejected any argument about another *Schow* issue—Garcia allegedly relying upon assurances. It found that Garcia may have "thought he was going to get 55 months. Now, that's his perception."

Even assuming the court did not perform a "no assurance" analysis, remand for the court to do so would be pointless. Garcia simply has failed to meet his burden to point to anything in the record on appeal about receiving "assurances" from his attorney, the State, or the court that could induce him to enter his plea. See *State v. Bryant*, 285 Kan. 970, 980, 179 P.3d 1122 (2008). "Assurance" is defined by The American Heritage Dictionary of the English Language 80 (1981) as "the act of assuring," while "assure" is defined as "to make certain; ensure." Consequently, Garcia has failed to meet his burden to demonstrate good cause to withdraw his plea. See *Schow*, 287 Kan. at 541.

Moreover, the recipient of any assurances can hardly be induced by them, or justifiably rely upon them, when they were based upon incomplete information caused by the recipient's intentional withholding of material facts from the assurer. To describe Garcia's obstacle in *Schow* language, when he withholds material informa-

tion from his counsel, the prosecutor, and the court, he certainly cannot show he was "given assurances about his or her criminal history score which are based upon *known facts.*" (Emphasis added.) 287 Kan. at 544.

A case directly on point regarding alleged assurances and misleading statements is *United States v. Mercedes Mercedes*, 428 F.3d 355 (1st Cir. 2005). There, defendant argued that he should be allowed to withdraw his guilty plea because it was involuntarily given due to misleading statements made by the court and his defense counsel at the plea hearing. Specifically, he claimed he relied upon these statements believing he would have the benefit of the so-called safety valve provision which would reduce his statutorily mandated minimum sentence.

The plea agreement noted that defendant would qualify for a reduction of his mandated sentence under the safety valve provision "if he had no more than one criminal history point," and it predicted that defendant would have a guideline sentencing range of 46-57 months "so long as he qualified for the safety valve." 428 F.3d at 357.

At the plea hearing, the court stated, " 'I understand at this time you don't have any criminal history,' " to which defense counsel replied, " 'Yes, Your Honor.' " 428 F.3d at 358. After acceptance of his guilty plea, a PSI was performed that revealed defendant was "wrapping up a term of supervised release related to a prior conviction." 428 F.3d at 358. Ultimately defendant was ineligible for the safety valve reduction and was sentenced to the 120-month statutory minimum sentence.

Defendant complained that the statements of the court and his counsel comprised "promises" and their nonfulfillment rendered his plea involuntary. 428 F.3d at 359. In rejecting this claim, the First Circuit pointed out, among other things, that defendant had told the court he understood the requirements for safety valve eligibility and acknowledged that a failure to meet them would subject him to the mandatory minimum sentence. It further stated:

"[I]it is readily apparent that the fault—if there was one—lies not with what others said but with the appellant himself. For whatever reason, he was not forthcoming when the magistrate judge questioned him directly about his criminal history.

*Given that lack of candor, the charge that the magistrate judge 'misled' the appellant rings hollow."* (Emphasis added.) 428 F.3d at 360.

The First Circuit then addressed the purported promises made to defendant by his counsel:

"We also reject the appellant's related argument that his former attorney's statement regarding his criminal history misled him. The attorney's statement that the appellant had no prior criminal record, quoted supra, was a response to a query from the bench, not a 'promise' directed at the appellant. Moreover, that statement can logically be read as mirroring the facts then known to the attorney. That is important because, as we said in an analogous situation, 'the appellant was in a far better position [than the attorney] . . . to supply the missing integer in the sentencing equation: his prior criminal record.' *Torres-Rosa*, 209 F.3d at 10. *Given the appellant's failure to correct the apparent misstatement and come forward with the information that he undeniably possessed, he cannot now blame the dashing of his hopes for a lesser sentence on his attorney."* (Emphasis added.) 428 F.3d at 360.

Because the defendant had raised this claim for the first time on appeal, the First Circuit was able to make its own determinations from the record of whether he had shown "fair and just" reason under the federal rules for his plea withdrawal. It concluded "without serious question, that the record contains no hint of error, plain or otherwise, such as would incline us to set aside the appellant's guilty plea." 428 F.3d at 360.

The facts in Garcia's case are even stronger. He freely admits he never told his counsel about the prior juvenile adjudication, while that was unclear in *Mercedes Mercedes*, 428 F.3d at 360 n.2. But had those been the facts in *Mercedes Mercedes*, "it would doom the appellant's request." 428 F.3d at 360 n.2 (" 'Clients should answer truthfully their attorney's inquiries about their past convictions, and lawyers are entitled to rely reasonably on the explicit representations of clients about their criminal histories.' ") (citing *United States v. Colon-Torres*, 382 F.3d 76, 86 [1st Cir. 2004]).

See *United States v. Torres-Rosa*, 209 F.3d 40 (1st Cir. 2000) (defendant's expectation as to his likely sentence, based upon his deception of the court about his criminal history, did not provide "fair and just reason" for withdrawal of his guilty plea); *Walker v. Warden Winn Correctional Center*, 191 Fed. Appx. 328, 330, 2006

WL 2062092 (5th Cir. 2006) (unpublished opinion); *State v. Codiga*, 162 Wash. 2d 912, 175 P.3d 1082 (2008); *State v. Bridgeforth*, 357 N.W. 2d 393, 394 (Minn. App. 1984), *review denied* (Minn. Feb. 6, 1985); *cf. Perry v. State*, 595 N.W. 2d 197, 200 (Minn. 1990) (affirming denial of second postconviction petition for withdrawal of guilty plea based on mistaken score where defendant knowingly concealed previous felonies). But see *State v. Robinson*, 172 Wash. 2d 783, 263 P.3d 1233 (2011) (defendant informed counsel of prior juvenile convictions but not the State; after receiving higher sentence than expected when convictions discovered, sought plea withdrawal; affirmed allowance of withdrawal as not an abuse of discretion).

These cases generally reinforce the conclusion that the issue with Garcia is not whether he should be compelled to assist the State through self-incrimination by supplying all of his past convictions and adjudications. Rather, the specific issue is whether Garcia may purposely omit any of this purely factual information from what he does voluntarily provide, plead nolo contendere, expect a sentencing range shaped by the omission—and then withdraw his plea after his knowing omission is discovered and he learns the sentence he expected will be increased accordingly.

In continuing my *Schow*-suggested use of *Edgar*'s factors, see *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006), to review the circumstances giving rise to the alleged mutual mistake, I turn now to the third factor—whether the plea was fairly and understandingly made. I agree that in *Schow*,

"[b]ased on the specific facts presented, [we] declined to attach significance to information provided by the district court at the plea hearing advising Schow of the maximum sentence that could be imposed and that the sentencing court was not bound by the State's recommendation of probation contained in the plea agreement." *State v. Lackey*, 45 Kan. App. 2d 257, 270, 246 P.3d 998 (2011).

But *Schow* is easily distinguishable from Garcia's case. While *Schow* stressed assertions and assurances in analyzing the third *Edgar* factor, there simply is no evidence that Garcia received any which could possibly dilute the effectiveness of the warnings provided by the district court to him. *Schow* is also readily distinguishable because Schow did not intentionally withhold any of his crim-

inal history from his own counsel, the State, and the court. As a result of Garcia deliberately withholding this material information, even if assertions or assurances had been given to him, he certainly cannot establish, in the words of *Schow*, that he *"reasonably believed* the assertions of the prosecutor and defense counsel that his criminal history score was" C. (Emphasis added.) *Schow*, 287 Kan. at 545.

Accordingly, Garcia's case contains parallels to the Court of Appeals' decision in *State v. Lackey*, 45 Kan. App. 2d 257. There the panel affirmed the district court's denial of Lackey's motion to withdraw his plea under *Schow*, noting that under the third *Edgar* factor he failed to present any evidence that he received assurances from anybody about his criminal history score being "E." Consequently, like the *Lackey* court, I do consider the court's warnings Garcia received as evidence to support the court's finding that his "plea was fairly and understandingly made." 45 Kan. App. 2d at 270.

Specifically, similar to *Lackey*, Garcia was informed at the plea hearing of the minimum and maximum sentences that could be imposed and that sentencing was left to the court's discretion in compliance with the Kansas sentencing guidelines. He was further informed that sentencing would depend upon his criminal history, which the court had no knowledge of at the time of his plea. Moreover, Garcia was told the court was not bound by any plea agreement. At the later plea withdrawal hearing, Garcia acknowledged having heard most of this information at the plea hearing. Finally, as in *Lackey*, Garcia was notified at the plea hearing of all his constitutional rights and that he would be waiving them by entering his nolo contendere plea. 45 Kan. App. 2d at 270.

The district court dutifully made many of these findings in denying Garcia's motion. The evidence amply supports them as well as the court's ultimate determination that Garcia's plea was fairly and understandingly made per the third *Edgar* factor. See *Lackey*, 45 Kan. App. 2d at 270.

In short, I conclude the district court essentially followed *Schow*'s guidance regarding the alleged mutual mistake about Gar-

cia's criminal history. It therefore did not abuse its discretion in denying Garcia's motion to withdraw his plea. For these reasons, I would affirm the district court and the Court of Appeals majority on this issue.

BILES, J., joins in the foregoing dissenting opinion.